Good morning, Your Honors. May it please the Court, my name is John Gabroi. I represent John Killingsworth, the appellant in this matter. If the Court please, I would like to reserve two minutes for rebuttal purposes. Your Honor, this Court has consistently emphasized that very little evidence is required of a plaintiff to survive summary judgment because the ultimate question can only be resolved through a searching inquiry, one that's most appropriately conducted by a fact finder upon a full record. In this Court's decision in Stiegel v. Citadel Broadcasting, the Court emphasized that an employer's true motive in an employment decision is rarely easy to discern. As we have previously noted, without a searching inquiry into these motives, those acting for impermissible motives could easily mask their behavior behind a complex web of post hoc rationalizations. Indeed, Your Honor, this Court has also stated that in a Title VII or other employment discrimination action which employs the analytical framework of McDonnell Douglas, when you arrive at the pretext stage, the burden is hardly an onerous one. Noyes v. Kelly, 488 Fed Third, also in Ninth Circuit opinion. Your Honor, finally, in the Noyes case, the Court also said that where the evidence of pretext is circumstantial rather than direct, the plaintiff must present specific and substantial facts showing that there is a genuine issue for trial. However, that requirement is tempered by our observation that in the context of Title VII claims, the triable issue of fact as to pretext is hardly an onerous one. Your Honor, we respectfully submit that in the case of Bench, the record is replete with genuine issues of material fact concerning the motivation of the decision makers in this case to take an adverse employment action against John Killingsworth. Your Honor, when it came to the trial court's analysis of whether or not a plaintiff had shown pretext, had shown that there was a genuine issue of material fact for purposes of pretext, the first thing that the Court looked at was the existence of the state action, the State Farm Affirmative Action Plan. And the Court said that that did not constitute direct evidence of discrimination for two reasons. Number one, because the plaintiff had not proved the invalidity of the plan. And secondly, because there was no nexus or connection between the State Farm Affirmative Action Plan and the adverse employment action taken in this case. Your Honor, we would submit that analytically and doctrinally, the trial court was incorrect in its analysis as a matter of law. It's only when a defendant offers evidence that it complied with its Affirmative Action Plan as part of showing a legitimate non-discriminatory articulated reason for the adverse employment action, that the burden then shifts to the plaintiff under Johnson v. Transportation to show that the plan is invalid. This was not a... But as I recollect the record in this case, the defendant is not even relying on that as their basis for having taken the actions that it did. That is correct, Your Honor. And that's why it's even greater evidence of direct discrimination. Your Honor, there are two cases in the Fifth Circuit decision and one is an Eleventh Circuit decision. The Fifth Circuit decision is Frank v. Xerox. And in Frank v. Xerox, there was an Affirmative Action Program and the court stated, quote, we find that the existence of the BWF program is sufficient to constitute direct evidence of a form or practice of discrimination. The other case that we cited to the trial court was Bass v. Board of Commissioners. There was also an Affirmative Action Plan in Bass. And what the Eleventh Circuit said in that case is, quote, and this responds directly to Your Honor's point, quote, furthermore, even when a defendant denies having acted pursuant to its Affirmative Action Plan, if there is evidence that it may have done so, a jury must decide whether the defendant in fact acted pursuant to its stated plan. And now, speaking only for myself, I'm willing to consider the existence of the plan as some evidence. But again, speaking only for myself, by itself, not enough to get you over the hump you need to get to. That is to say, for me, if I could put it into the jargon of summary judgments, for me, it doesn't get past the scintilla. It's not irrelevant, but for me, by itself, it's not enough. What else do you have? Okay. Your Honor, we have an abundance of other evidence that created genuine issues of material fact for purposes of Rule 56. Your Honor, I understand that the Court says that the existence of the Affirmative Action Plan by itself may not be sufficient. No. You better not say that as to the Court. You heard me say it. I'm sorry. My colleagues have been silent on the question. Judge Fletcher, I appreciate the silence sufficiently to say I'd be interested in seeing what else you might have, because without something else, you probably don't have enough. Well, not only does it constitute direct evidence of discrimination, in which case the decision is going to be with the fact finder as to what ultimately motivated the decision maker. It also constitutes circumstantial evidence of pretext in this regard. In 2000, Gonzalez comes to become regional vice president of the Sunland region. In 2000, State Farm's president's planning message is handed down, and it's stated that diversity is a goal, and that the regional vice presidents are going to be financially incentivized if they are able to hire minorities and women and promote them into management positions. One of the articulated process goals in the year 2000 is exactly that, that the executive, the regional vice presidents and the vice presidents of agency here, Mr. Gonzalez and Mr. Danowitz respectively, receive something called a senior management incentive program bonus, referred to as SMIPS. And if they comply with the 2000 process goal, they're eligible to have their bonus increased by 10%. Indeed, there's a disincentive if they don't comply or try to obtain the 2000 process goal of hiring minorities and promoting them into positions of management, they are subject to a 10% diminishment of their bonus. In 2001, the process goal says, we adopt the 2000 goals. So that's certainly by inference, if not explicitly, the 2001 process goal saying that if you're a regional vice president or vice president of agency and you promote women and minorities into management positions, you will financially benefit by virtue of a 10% increase in your bonus. So that's also in play in the year 2001. What happens is that my client, middle-aged, white, very successful manager for State Farm, is ultimately replaced by a younger Hispanic agency field executive by the name of Mr. Martinez. As a result of that, the record also conclusively establishes that Mr. Gonzalez reports that fact. The fact that a minority candidate has been promoted into a management position of agency field executive reports that fact in his 2001 year-end report to State Farm management, pursuant to which he receives 10% in excess of his bonus. So far, we're not talking about the reasons State Farm has given for the adverse actions they took against your client. Could you address those? Yes, Your Honor. And the only reason that I laid that as a predicate is to show that there was evidence of a motive here to allege reasons against Mr. Killingsworth which were pretextual in nature. Let's get to the reasons stated. Your Honor, for over 20 years, Mr. Killingsworth had an exemplary record with State Farm. His management style, his conduct had never been criticized. He was an extremely successful manager. He had achieved what's called inner circle status on three or more occasions, most recently in the year before this adverse employment action in the year 2000. And in June of 2001, he's called into a meeting where Mr. Gonzalez says to him that certain members of his agency field group have leveled complaints against him, that he's threatened their jobs, he's threatened them physically, he has a harsh managerial style, etc. Mr. Killingsworth goes on later to dispute those facts in very specific detail. But in any event, Mr. Gonzalez says to him, unlike any other agency field executive in the history of State Farm, you are to leave your office, you are to have no communication whatsoever with your employees while we investigate. The record also shows that at the conclusion of that meeting, Gonzalez, Danowitz had already made up their minds. They said that Mr. Killingsworth has failed his leadership responsibility and they listed six specific reasons. So prior to the investigation which they say they're going to conduct, Your Honor, and prior to giving Mr. Killingsworth an opportunity to rebut the allegations that had been made against him, they had already made their decision. And why had they made that decision? Because in April, two months earlier of 2001, there is evidence that the home office had sent Mr. Martinez to take Mr. Killingsworth's place as the agency field executive. The memo says when the promotion of Mr. Martinez to agency field executive takes place, etc., etc. Now, was it clear that the only way he could be promoted to that position was to take Mr. Killingsworth's job? Yes. Could you point me in the record to where that, in the excerpt, to where that memo is? Well, Mr. Killingsworth is the agency field executive for the Phoenix metro region. There is only one agency field executive for that region. There are other agency field executives in Arizona, but the specific position that Mr. Martinez was put in was Mr. Killingsworth's. Yeah. Could you put my, I've got the excerpt right here. Could you show me where I should look to find that memo? If it's going to take you too much time, you can look during the time, the other side and come back. Okay. Do you want to do it that way? Yeah. Your Honor, it's an April 2001 memo, and it's a memo whereby it's acknowledged that Martinez is going to be sent to Mr. Killingsworth's agency field office. Listen, find it when the other side is talking, and then we're done. Don't delay yourself now. All right. Thank you, Your Honor. Yeah, sure. Your Honor, there was an abundance of evidence showing that the articulated reasons by Mr. Gonzales were not worthy of belief, either because they were internally inconsistent or because they simply weren't worthy of belief. Examples. Mr. Killingsworth is demoted because he allegedly referred to a lady as blondie. Mr. Gonzales never speaks with a woman who is a woman. Mr. Killingsworth never speaks with the lady to whom Mr. Killingsworth supposedly referred to as blondie. How about the other one, Marianne Enriquez? Marianne Enriquez. I changed your name because it was hard to pronounce. Which was disputed, Your Honor. And I can't emphasize enough to the Court that every reason, every excuse offered up by State Farm for taking disciplinary action against Mr. Killingsworth was factually denied and rebutted by Mr. Killingsworth. I guess the important thing is whether not whether it was accurate or not, whether it was reasonably reasonable to believe it. Well, Your Honor, with all due respect, I don't believe that that is the legal standard. Even if management believed these allegations and accusations to be true, and I think that we submitted a lot of evidence showing that they didn't believe it, but even if they had, doesn't mean that they weren't motivated by a discriminatory purpose. The seminal case, McDonnell Douglas, the employee had undoubtedly committed the wrongdoing of which he was accused. Nevertheless, the Court went on to see whether or not that was the real reason that adverse employment action was taken against him or whether it was pretextual in nature. So that, and I know that State Farm constantly emphasizes this in their opposing brief, but the subjective belief of the management here was put at issue, it seems to me, by the fact that Mr. Martinez was preselected to take Mr. Killingsworth's position, that Mr. Killingsworth had an exemplary record before Mr. Gonzalez and Mr. Danawitz started this investigation, and that they stood to financially gain by getting Killingsworth out and putting Martinez in. But to show that State Farm in fact could not or should not have believed that there was a genuine issue as to what their true motivation was, take the accusation where Marcela Busto says to Gonzalez, Mr. Killingsworth made a sexual comment about me. He said that we're, quote, all wet at Aldo, we're all wet at the AFO over your Aldo production. And also that the Filipinos were the laziest in the world. Categorically denied by Mr. Killingsworth. Whose two sons are Filipinos. So again, each and every reason for the adverse employment action is factually denied by Mr. Killingsworth, and he also submits voluminous written documentation in support of his denials. Surely, an inference can be drawn by the fact finder that these charges were either exaggerated or false, or that they were offered for a discriminatory purpose. But in any event, going back to Marcela Busto. Well, I think the real test is whether they're believable to the decision maker. Your Honor, even if they were believable to the decision maker, what we submit is that there is also evidence in this record showing that the decision maker had a discriminatory purpose for doing what he did. And the fact that a stated reason for the adverse employment action may be accepted by the jury down the line, may be credited by the jury at trial, doesn't mean that the possible discriminatory motive of the decision maker evaporates. They're both at play. We're not saying, and I'm not suggesting, that the jurors in this case could not accept the stated reasons for the adverse employment action. What I am suggesting is that the jurors don't have to credit. They don't have to accept the inferences, which the trial court accepted. They don't have to accept as true what Mr. Gonzales says he believed. And most importantly, there's evidence in the record that Gonzales really didn't believe what he stated. He really didn't believe some of the accusations that had been made against Mr. Killingsworth. And not only that, he goes out after Mr. Killingsworth has been demoted on the first occasion. The investigation is closed in June 2001. It's reopened by Mr. Gonzales in August 2001. He relies on allegations of events that occurred as long as eight years prior. This is the rental of the office. Yes, 1993. But when were these events brought to his attention? He says they were brought to his attention in 2001, and I don't doubt that they were, because he didn't come to the Sunland region until calendar year 2000. But the point is, Your Honor, and the record evidence is clear on this. When Mr. Gonzales speaks with Marcella Busto, he says, is there anybody else I should talk to? And she refers him to this individual who denies ever having a conversation with her, and thus the issue of the lease of the Yuma building, for which Mr. Killingsworth had already been exonerated, comes into play. You know, we're down to 51 seconds. Why don't we magically increase the 46 seconds to two minutes, and we'll save that for you. Thank you, Your Honor, and I'll try to find the citation to the April 2001 memo. If you could find it in the excerpts, that would be helpful. Thank you. If it pleases the Court, Charles L. Chester and Kelly K. Johnson for the Appalese State Farm and Gonzales. The citation to the record you're looking for is at clerk's record, excuse me, the excerpt of record 789, I believe. In my prepared statements, I'm going to address constructive discharge. The contract issues very briefly and the pretext issues on the first demotion. Obviously, I'll answer any questions that the Court has on any other issues. Turning first to constructive discharge, there are three undisputed facts that establish that plaintiff was not constructively discharged. This Court sets a bar high for a claim of constructive discharge because anti-discrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship. That's the very recent Poland decision at 494, Fed 3rd, 1174. It's not cited in the briefs. It was handed down since. Poland goes on to note, therefore, an employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged. That's exactly what Mr. Killingsworth did. He never complained of race or age discrimination. Is there any dispute that there was adverse employment action? Pardon? Is there any dispute that there was adverse employment action taken? I'm really not sure why constructive discharge becomes the first issue because he was demoted. And so why the focus on constructive discharge? Please, the Court, Mr. Killingsworth argued that there were two adverse employment actions. I understand that, but since we know that the motion is on the table, and so even if you prevail on constructive discharge, the case still sits here. That doesn't justify the summary judgment for the whole case. It would, however, on the issue of constructive discharge if the Court in its discretion chose to remand the case in reverse. In addition to that, Mr. Killingsworth, and I'll move on very briefly, given the Court's predilection. Mr. Killingsworth. I'm speaking only for myself here, but it seems to me there are issues that have been discussed that go to the whole case, and that's probably of greater interest than severing off possibly one piece. As I say, and I respect your view, Your Honor, obviously, Mr. Killingsworth quit to take another job that he wanted since mid-June of 2001. He wasn't constructively discharged, and at the time he did that, he had a job he viewed as very viable, doing very important work, and had a pay level that had kept him there for four months. He left to go become an agent with another company. Okay, okay, yeah, we got it. Now, turning to the contract issue very briefly, the Arizona law says that if there's a non-binding clause, then you don't go beyond that. In this instance, Mr. Danowitz said consistently, no promises, there's a no-binding clause. Could we get to the issue that occupied most of our time in the argument? That is to say the argument that there's actionable discrimination. And I actually just turned to that, and I apologize. There's no direct evidence of discrimination. The court has noted that you have to draw inferences to get there. Therefore, you have to establish, in order to be reversed, there has to be some specific substantial evidence of pretext. And there is none. Looking at the falsity issue, which the court focused on with Mr. Gabroi, under Villarimo, the court has established that falsity is not a question of the objective truth of the conclusions reached. The question is whether or not Mr. Danowitz, who authored the demotion memo and Mr. Gonzales, his supervisor, honestly believed what they said was their basis for acting. And the record is loaded with evidence upon which they could have reached that belief, and there's no evidence that they did not honestly believe that. The Employment Discrimination Law Treatise just came down in the fourth edition recently, notes three other general categories of evidence that this court would typically look to. Discriminatory statements, comparative evidence, and statistical evidence. The discriminatory statements are off the table because Mr. Killingsworth admitted at Supplemental Record 87 and 88 that there were no discriminatory statements made by Gonzales, Danowitz, or anyone else in the management of State Farm. In his reply brief... Well, that's not quite true. You can put it to one side as of limited relevance, but that article that comes out in the employee news organ in the Northwest, it comes out later, I understand, and so on, but it says shedding the 50-year-old middle-aged white guy image, hmm, there's some evidence. You put it in a little corner, I understand that, but it's there. Your Honor, that article is written in another region. I understand. Eight or nine months after he leaves. I understand that, too. And it addresses, if the court will read the article, it'll note that it talks about becoming involved in communities, and it talks about recruiting minorities. I understand all of those things. And that is not... That's a leap to say that's evidence of discriminatory motive of individuals in a different region earlier who are the actual decision-makers would be my thought there. The plaintiff says that he's not relying on comparative evidence or statistical evidence. He makes that specifically in page 18, I believe, of his reply brief. That brings us to the edge of, quote, other evidence of pretext, and if it pleases the court, I'll focus on Mr. Martinez because that's what the court was interested in. Plaintiff says that Mr. Martinez was pre-selected to replace him and that that's something that can be inferred. I want to talk about the actual evidence and then the court can determine whether or not reasonable inference would be that which plaintiff advocates. The evidence is that in January, Mr. Martinez tells Mr. Weeks, I want to go to the Sunbelt, to a field position, and I want to go at my own salary that I've got right now. That's ER 547-48. In February, Mr. Danowitz talks to Mr. Martinez and tells him about the agency center that's opening in the Sunland region. That's ER 556. In March, Mr. Weeks, Mr. Martinez's boss at corporate, announces that Mr. Martinez will be relocating to Phoenix around July to spearhead a new agency service center. That's completely consistent with what we know to be the case. Six days later, Mr. Danowitz gives Mr. Killingsworth a commendable appraisal, not something he would do if you're going to get rid of him. In April, the corporate payroll department does say when Mr. Martinez becomes an AFE, you would prorate that bonus. But it also says at the same page, it says, we don't know what he's been told or what he's been promised. On the next page of the record, at ER 790, the region addresses that. Ms. D'Andrea reminds Mr. Danowitz, we're not bringing him down here to be an AFE. That's the only job we've got that has this FA-5 salary range. That's why we've got this special title for him, AMA. Mr. Martinez testified that neither Mr. Gonzalez, Mr. Danowitz, or Mr. Weeks led him to believe that he was going to get an AFE position down here. He said that he personally believed he would because he'd been a successful AFE in Chicago and he had been, he was moving to a growing area, if you will, Phoenix. That's at the excerpt of Record 556. In May and June, the staff comes forward that Mr. Killingsworth AFO and Mr. Killingsworth is removed and eventually demoted. In July, there's a vacancy, and in July, a committee chooses Mr. Martinez. In September, plaintiff knows he's been demoted, plaintiff knows his agency goal is at risk, and yet he writes to Mr. Wright, and he says to Mr. Wright, Mr. Martinez was new to the region. The plan was for Mr. Martinez to work under me as his supervisor at the new agency center. That is exactly what Mr. Weeks announced back in March. And that subsequent to the proceedings that I'm now talking to you about, that is his bad, his difficulty with his employment, then Mr. Martinez' plans were changed. He doesn't believe in September that this was a preordained matter. And then in year end, the 2001 performance or process goals that have been discussed. The court will remember that diversity was one of the goals, and I would respectfully submit it's not an affirmative action plan, it's a diversity plan, a diversity policy and program, and that's a laudable program under the Peterson case. It's not an unlawful program. There are no goals set, statistical goals or anything of that nature in that plan. There's no evidence of that whatsoever. But anyway, more important than that, in that report, Mr. Gonzalez takes credit for bringing Mr. Martinez to the region. But he takes credit for bringing Mr. Martinez to the region as a leadership and development move by moving people from corporate to the region. It's a completely separate part of the process goals, a third part of those goals. He does not take any credit whatsoever in the diversity section of his report. And in fact, if you look at the diversity section of his report, a great deal of it deals with diversity in the broadest sense, cultural sensitivity, communications, what have you, not hiring and promotion of minorities. And this 2001 process goal that he's dealing with, if it pleases the court, is a process goal that has diversity in it, just like the 2000 goal, but it does not have the admonition that was in the 2000 diversity subgoal saying, we're going to look and see if you're promoting minorities and women to leadership. That is eliminated in 2001 Based upon those items of evidence, if you will, I would respectfully submit that it is not reasonable to conclude or to infer that Mr. Killingsworth's, that Mr. Martinez's was brought to the region to replace Mr. Killingsworth because of his age and because of his race. Unless the court has other questions, I certainly would be glad to answer them. Mr. Martinez... Well, this is kind of a generic question. It is a little puzzling to me. How we can have a man who has been so successful for so long all of a sudden lose it in such a spectacular fashion? Well, if it pleased the court, I believe it was in Pottinger, or it may have been in Villarimo's case, that this court noted that the fact of a clean record is not ever... Well, but you see, this is not just a clean record. He has been promoted, he's been honored, all kinds of good things are happening, and then all of a sudden we get these meetings and all of a sudden apparently the management style that has been pretty consistent all along, I gather he's kind of a hard, I'll say a hard nose, and he rides his people, and some people don't like that, but it doesn't sound as though he's different. So what's going on here? Well, Your Honor, I don't know whether he's different or not. What I do know is that it's not unusual, and I don't mean to raise this to this level, but it's not unusual for the individual suffering under a tyrant to not speak up until one does, and then they get the courage to do so and they come forward. In this instance, Ms. Enriquez filed a charge of discrimination in January. That's not Mr. Danowitz's doing or Mr. Gonzalez's doing. Ms. Bustos comes to Mr. Danowitz. Mr. Eisenbraun comes to Mr. Danowitz. Mr. Aikens comes to Mr. Gonzalez. Now, why did they suddenly get the courage to do that? Maybe it's because exactly what they said. They were being threatened. If you don't take my side against Mr. Eisenbraun, I'm going to have your job. Now, that might scare somebody to the point where they would go around their boss and say, and that's what the evidence supports. Was there a new open-door policy that brought this about? No. The open-door policy, Your Honor, had existed for quite some time. Mr. Aikens exercised that, just as Mr. Kellingsworth did in September. It's the same informal review policy where you come around your boss and talk to someone else. Why wouldn't they have come around their boss then? Why didn't they come around Mr. Kellingsworth? Earlier. Earlier? Mr. Aikens had been there for a few months. That might explain his. Ms. Bustos, Mr. Kelly, Mr. Hamilton were all trainee agents. Their livelihood depended on pleasing Mr. Kellingsworth. They had to do what they were told. And there's no question that there was clear discussions of racial insensitivity. There was clear discussions of abusive management style. There's no question about that. That timing is timing that relates to their being in the record an indication that Mr. Eisenbraun and Mr. Kellingsworth were coming to a head in their conflicts. And Mr. Kellingsworth was telling Ms. Farmer, Mr. Aikens, you take my side against Eisenbraun or you're out. Now, that all is coming together in mid to late May, early June. The record would support that. That might explain the timing if that answers the court's question. Thank you. If the court has no other questions... I'll sit. Thank you very much. Response. Thank you, Mr. Chester, for that citation to the record. It is ER-789. It's the April 2001 email explaining Martinez's eligibility for the AFE transition bonus that it says, quote, when the promotion to an AFE takes place, close quote. Counsel indicated that Mr. Kellingsworth testified that it was the game plan for Martinez to come to the Sunland region. But at the time, Mr. Kellingsworth was unaware of this April 2001 memo. This was produced during the discovery process after the lawsuit was filed. Yes, but I'm now reading in these memos, and I've got them here in front of me. You correctly read from the memo on 789, and these were... Ah, okay. Mike, this is... I'm now on 790. This is subject Eloy. Now, is Eloy Mr.? Martinez. Martinez, yeah. And this is from... Ellen Mandreas. Is she headquarters? Ellen D'Andrea is in the Sunland region. She's in the headquarters. She writes, Mike, this is corporate compensations recommendation for Eloy. The FA-5 is the salary administration portion, only since his current salary is within that range. Since the only job we have in an FA-5 is AFE, and that is not our intent for Eloy, we're creating a job title for him in the AFC role. Your Honor, all that shows is that D'Andrea was not aware of Mr. Gonzalez's plan. Mr. Gonzalez knew Mr. Martinez from back when they were corporate headquarters. He came out here, and certainly there is an inference that he had it in mind all along to promote Mr. Martinez to Mr. Killingsworth's AFE position. Your Honor, I think that what this discussion shows beyond any question is that there were substantial issues of fact with respect to pretext where differing inferences could be drawn. And in that regard, I would summarize by the fact that a corporate human resources officer, upon reviewing the entirety of this file, wrote that there was a rush to judgment with respect to Mr. Killingsworth, questioned whether Mr. Gonzalez had solicited this evidence, stated that if plaintiff had disclosed his ownership interest in the Yuma building, quote, we have a problem, close quote.  State Farm's position was, quote, only if the matter proceeds to court, close quote. So not only is there an abundant factual record, Your Honors, that the stated reasons for the first demotion and for the second demotion, which was rescinded, um, were not true and were internally inconsistent and were not worthy of belief. Here you have State Farm's own management questioning what went on here. There are a lot of blanks that needed to be filled in in this case, Your Honor. There were a lot of unanswered questions. The trial court accepted every disputed issue of fact in defendant's favor, resolved every inference created by the evidence in defendant's favor, misstated the law, um, and improperly found, uh, on summary judgment against plaintiff. Your Honor? Thank you. I was going to just cite, uh, Chuang v. Davis, um, where there's also an issue of pretext and one thing that the Ninth Circuit said in that case was that one of the reasons given for the adverse employment action was disputed at deposition by the person who supposedly said it. Here we had innumerable instances of where Mr. Gonzales said one thing and it was disputed at deposition by those who supposedly said it. Thank you very much. Thank both sides for their helpful argument. The case of Killingsworth v. State Farm is now submitted. Pomeroy Corporation v. Balfour has been taken off the calendar and we are now in recess to reconvene tomorrow morning.
judges: Brunetti, Fletcher, Clifton